1

2

3

4                    IN THE UNITED STATES DISTRICT COURT

5                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7    CONSTANCE CHIULLI, et al.,          Case No.  22-cv-06225-MMC

8                 Plaintiffs,

9           v.                          **ORDER GRANTING IN PART AND
                                        DENYING IN PART DEFENDANT'S
10   AMERICAN HONDA MOTOR CO.,           MOTION TO DISMISS; GRANTING
     INC., et al.,                       LEAVE TO AMEND; DIRECTIONS TO
11                                       PARTIES**

                  Defendants.

12

13          Before the Court is defendant American Honda Motor Co. Inc.'s ("Honda")[1] motion,

14   filed May 1, 2023, "to Dismiss Plaintiff's Second Amended Class Action Complaint."

15   Plaintiff Constance Chiulli ("Chiulli") has filed opposition, to which Honda has replied.

16   Having read and considered the papers filed in support of and in opposition to the motion,

17   the Court rules as follows.[2]

18                                   **BACKGROUND**

19          Plaintiffs are six individuals who each purchased a new or used 2016-2020 model

20   year Honda Civic or Accord (hereinafter, "the Subject Vehicles") equipped with an

21   integrated in-vehicle communication and entertainment system (hereinafter, "Infotainment

22   System").  (See SAC ¶¶ 17-18, 28-29, 39-40, 49-50, 59-60, 68-69.)  In this putative class

23   action, they allege the Infotainment System in 2016-2020 model year Honda Civics,

24   Accords, and CR-Vs (hereinafter, "the Class Vehicles") is defective in that it

25   _____

26          [1] Although the operative complaint, the Second Amended Class Action Complaint
     ("SAC") also names Honda Motor Co., Ltd. ("HMC") as a separate defendant, HMC has
27   not been served.

28          [2] By order filed July 10, 2023, the Court took the matter under submission.

United States District Court
Northern District of California

United States District Court
Northern District of California

"malfunctions, freezes, or crashes, which in turn causes the inoperability of one or more features (including, inter alia, the navigation; heating, ventilation, and air conditioning ('HVAC'); music/radio; display screen; Bluetooth/phone; and backup camera functionalities) (hereinafter, "the Infotainment System Defect").  (See SAC ¶ 4.)

Plaintiffs allege the Infotainment System Defect "poses an unreasonable safety hazard" in that it "causes drivers to become distracted, by impairing or rendering inoperative many of the Infotainment System's safety features."  (See SAC ¶ 108.)  In particular, plaintiffs allege that "once the [Infotainment System] Defect has manifested . . . a driver often cannot, among other things: (1) pair an electronic device using Bluetooth; (2) answer calls or make calls, even if the driver's cellular phone was paired via Bluetooth before the [Infotainment System] Defect manifested; or (3) use the navigation system by viewing nearby vendors, such as gas stations, on the display, or entering destinations into the navigation system."  (See SAC ¶ 109.)  Further, plaintiffs allege, "the [Infotainment System] Defect often results in distortion, masking, or canceling out of the rear-view camera's images, rending the camera unusable."  (See SAC ¶ 110.)  Plaintiffs allege that "[d]rivers become accustomed to the use of back-up and blind-spot cameras" (see SAC ¶ 111), that "when the blind spot feed fails, drivers continue to, out of habit, look at the blank screen for cues about blind spots and obstructions, only to realize the screen is blank and that they must adjust their driving behaviors in real time" (see SAC ¶ 111), and that "[a] freezing back-up camera feed can give the driver the false impression that there are no obstructions behind their vehicle as they reverse" (see SAC ¶ 112).

Plaintiffs allege they experienced manifestations of the Infotainment System Defect as follows:

- Constance Chiulli is a California resident who, "[o]n or around May 27, 2019, . . . purchased a new 2019 Honda Civic from Walnut Creek Honda, an authorized Honda dealership in Walnut Creek, California."  (See SAC ¶¶ 17-18.)  "Shortly after purchase," she "began experiencing Infotainment System problems."  (See

SAC ¶ 22.)  In particular, "her vehicle's infotainment system would not recognize her phone, its screen would go blank, its microphone would not function, and its cameras would not function."  (See SAC ¶ 22.)

- Joshua Meisel is a California resident who, "[o]n or around September 16, 2018, . . . purchased a used 2016 Honda Civic with approximately 26,237 miles on the odometer from Galpin Honda, an authorized Honda dealership in San Fernando, California." (See SAC ¶¶ 28-29.) "Within six months of his purchase, . . . Meisel began experiencing [I]nfotainment [S]ystem problems"; specifically, "his vehicle's [I]nfotainment [S]ystem will completely fail, lose Bluetooth functionality, show distorted images and text, and fail to generate a clear image from the backup camera, not recognize his phone, its screen will go blank, its microphone will not function, and its cameras will not function." (See SAC ¶ 33.)

- Jacob Mongtomery is a Florida resident who, "[o]n or around June 26, 2021, . . . purchased a used 2017 Honda Accord Touring with 10,807 on the odometer from Page Honda of Bloomfield, an authorized Honda dealership located in Bloomfield, Michigan." (See SAC ¶¶ 39-40.) "Within a few months of ownership, when the vehicle had approximately 15,000 miles on the odometer, . . . Montgomery noticed that the Infotainment System in his vehicle [was] malfunctioning, particularly when trying to use Apple CarPlay or use the navigation." (See SAC ¶ 44.)  In particular, "[t]he screen on the Infotainment System [would] black out," forcing Montgomery to "restart his vehicle to get it functioning again." (See SAC ¶ 44.)

- Jedediah Beech is a Maryland resident who, "[o]n or around September 4, 2017, . . . purchased a new 2017 Honda Civic from Ourisman Honda of Tyson Corners, an authorized Honda dealership located in Tyson Corners, Virginia." (See SAC ¶¶ 49-50.) "In or around January 2018," Beech "began noticing that the Infotainment System in his . . . [v]ehicle exhibited unresponsiveness, including freezing when connecting his phone, and occasionally required him to restart the vehicle to unfreeze the system." (See SAC ¶ 54.)

3

- David Susseles is a Maryland resident who, "[o]n or around October 5, 2019, . . . purchased a certified pre-owned 2018 Honda Accord with 4,317 miles on the odometer from O'Donnell Honda, an authorized Honda dealership located in Ellicott City, Maryland." (See SAC ¶¶ 59-60.) "Within a few months of ownership," Susseles "noticed that the Infotainment System in his vehicle [was] malfunctioning, particularly when trying to use Apple CarPlay." (See SAC ¶ 64.) In particular, "[t]he Infotainment System would reset itself and stop in the middle of GPS service, distracting him while driving." (See SAC ¶ 64.)

- Thomas Kreidel is a Virginia resident who, "[o]n or around March 18, 2017, . . . purchased a new 2016 Honda Accord from Priority Honda, an authorized Honda dealership located in Chesapeake, Virginia." (See Sac ¶¶ 68-69.) "Within a few months of ownership," Kreidel "began to experience the Infotainment System Defect." (See SAC ¶ 73.) "Specifically, the Infotainment System [would] freeze[], usually within ten minutes of use of Apple CarPlay, forcing . . . Kreidel to unplug his phone and wait for the Infotainment System to reboot"; also it would "turn itself off without warning." (See SAC ¶ 73.)

Plaintiffs allege that, as early as 2015, "Honda knew about the Infotainment System Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to Honda and its dealers who are their agents for vehicle repairs, consumer complaints regarding earlier model years equipped with the same Infotainment System, testing conducted in response to those complaints, high failure rates and replacement part sales data, consumer complaints to the NHTSA [National Highway Traffic Safety Administration] (which Honda monitors), by developing TSBs [Technical Service Bulletins] in an effort to address the Infotainment System Defect, and through other aggregate data from Honda dealers about the problem." (See SAC ¶ 138.) Plaintiffs allege that, had they "known of the Infotainment System Defect, they would have paid less" for their vehicles, "or would not have purchased or leased them" at all. (See SAC ¶ 150.)

United States District Court
Northern District of California

1    Plaintiffs further allege that the Class Vehicles are covered under a warranty.  In

2  particular, the SAC alleges that defendants "sold the Class Vehicles with a 3-

3  year/36,000-mile New Vehicle Limited Warranty ('NVLW')," which warranty "purports to

4  cover the Infotainment System" (see SAC ¶ 7), and provides, in relevant part, that

5  "Honda will repair or replace any part that is defective in material or workmanship under

6  normal use," and that "[a]ll repairs/replacements made under this warranty are free of

7  charge" (see SAC ¶ 231).  Plaintiffs allege Honda breached the NVLW "by selling and

8  leasing Class Vehicles with Infotainment Systems that were defective, requiring repair or

9  replacement within the warranty period, and refusing to honor the express warranty by

10  repairing or replacing, free of charge, the Infotainment System."  (See SAC ¶ 232.)

11  Additionally, plaintiffs allege, "when [Honda] did agree to pay a portion of the costs,

12  [Honda] nevertheless breached the express warranty by simply replacing Class

13  Members' defective Infotainment Systems with similarly defective Infotainment Systems,

14  thus failing to 'repair' the defect."  (See SAC ¶ 232.)

15    Based on the above allegations, plaintiffs assert, on behalf of a putative

16  nationwide class[3] and six sub-classes,[4] the following seventeen causes of action: (1)

17  "Violation of California's Consumer Legal Remedies Act, California Civil Code § 1750, et

18  seq." ("CLRA"); (2) "Violation of California Business & Professions Code § 17200 et seq."

19  ("UCL"); (3) "Breach of Implied Warranty Pursuant to Song-Beverly Consumer Warranty

---

[3] The nationwide class is defined as "[a]ll persons and entities in the United States who purchased or leased a Class Vehicle (the 'Nationwide Class' or 'Class')."  (See SAC ¶ 180.)

[4] The six sub-classes are: a "California Sub-Class," defined as "[a]ll members of the Nationwide Class who reside in the State of California"; a "CLRA Sub-Class," defined as "[a]ll members of the California Sub-Class who are 'consumers' within the meaning of California Civil Code § 1761(d)"; a "California Implied Warranty Sub-Class," defined as "[a]ll members of the Nationwide Class who purchased or leased their vehicles in the State of California"; a "Maryland Sub-Class," defined as "[a]ll members of the Nationwide Class who purchased or leased their vehicles in the state of Maryland"; a "Michigan Sub-Class," defined as "[a]ll members of the Nationwide Class who purchased or leased their vehicles in the state of Michigan"; and a "Virginia Sub-Class," defined as "[a]ll members of the Nationwide Class who purchased or leased their vehicles in the state of Virginia."  (See SAC ¶ 180.)

Act, California Civil Code §§ 1792 and 1791.1, et seq."; (4) "Breach of Express Warranty Pursuant to Cal. Com. Code §§ 2313, 10210"; (5) "Violation of Maryland's Consumer Protection Act, Md. Code Ann., Com. Law § 13-101, et seq."; (6) "Breach of Express Warranty Pursuant to Md. Com. Law §§ 2-313 and 2A-210"; (7) "Breach of Implied Warranty Pursuant to Md. Com. Law §§ 2-314 and 2A-212"; (8) "Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903, et seq."; (9) "Breach of Express Warranty, Mich. Comp. Laws § 440.2313";[5] (10) "Breach of the Implied Warranty of Merchantability, Mich. Comp. Laws § 440.2314"; (11) "Violation of the Virginia Consumer Protection Act, Va. Code Ann. § 59.1-200(A) et seq."; (12) "Breach of Express Warranty, Va. Code Ann. §§ 8.2-313"; (13) "Breach of the Implied Warranty of Merchantability, Va. Code Ann. § 8.2-314"; (14) "Breach of Express Warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2303 et seq."; (15) "Breach of Implied Warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2303 et seq."; (16) "Fraud by Omission or Fraudulent Concealment"; and (17) "Unjust Enrichment."[6]

## LEGAL STANDARD

Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). Rule 8(a)(2), however, "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" See Bell Atlantic Corp. v.

---

[5] Plaintiffs have withdrawn the Ninth Cause of Action, for Breach of Express Warranty under Michigan law (see Opp. 11 n.3), and, accordingly, Honda's motion to dismiss that claim is hereby DENIED as moot.

[6] Plaintiffs bring the First and Third Causes of Action on behalf of the CLRA Sub-Class and the California Implied Warranty Sub-Class, respectively. Plaintiffs bring the Second and Fourth Causes of Action on behalf of the California Sub-Class, the Fifth through Seventh Causes of Action on behalf of the Maryland Sub-Class, the Eighth through Tenth Causes of Action on behalf of the Michigan Sub-Class, and the Eleventh through Thirteenth Causes of Action on behalf of the Virginia Sub-Class. Plaintiffs bring the remaining Causes of Action on behalf of the Nationwide Class, or, alternatively, on behalf of all sub-classes.

United States District Court
Northern District of California

Twombly, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).  Consequently, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations."  See id.  Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than . . . a formulaic recitation of the elements of a cause of action."  See id. (internal quotation, citation, and alteration omitted).

In analyzing a motion to dismiss, a district court must accept as true all material allegations in the complaint and construe them in the light most favorable to the nonmoving party.  See NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).  "To survive a motion to dismiss," however, "a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  "Factual allegations must be enough to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation," see Iqbal, 556 U.S. at 678 (internal quotation and citation omitted).

## DISCUSSION

By the instant motion, Honda seeks an order dismissing each of plaintiffs' causes of action, arguing that (1) plaintiffs lack standing to bring claims for vehicles they did not lease or purchase; (2) plaintiffs' claims under the Magnuson-Moss Warranty Act ("MMWA Act") are subject to dismissal for failure to name 100 plaintiffs; (3) plaintiffs' express warranty claims are subject to dismissal for failure to state a claim; (4) plaintiffs' implied warranty claims are subject to dismissal for failure to state a claim; (5) plaintiffs' fraud by omission and fraud-based consumer protection claims are subject to dismissal for failure to state a claim; (6) plaintiffs' unjust enrichment claim is subject to dismissal because plaintiffs have other remedies at law; and (7) Beech and Kreidel's claims are time-barred. The Court addresses Honda's arguments in turn.

### A.  Standing as to Products Not Purchased

At the outset, Honda argues plaintiffs "lack Article III and statutory standing to

7

1    pursue claims for vehicles they never leased, purchased, or used" (see Mot. 7:13-15),

2    namely, 2016-2020 Honda CR-V's (see Mot. 1:19-21).  In response, plaintiffs contend

3    they have standing to bring such claims because they "have pled sufficient similarities

4    between all of the asserted Class Vehicles."  (See Opp. 5:12-13.)

5        A district court has subject matter jurisdiction only where the plaintiff has

6    "[s]tanding to sue" under Article III of the Constitution. See Spokeo, Inc. v. Robins, 578

7    U.S. 330, 338 (2016).  To satisfy Article III's standing requirements, (1) "the plaintiff must

8    have suffered an injury in fact" that is "concrete and particularized" and "actual or

9    imminent, not conjectural or hypothetical," (2) the injury must be "fairly traceable" to the

10   challenged conduct of the defendant, and (3) "it must be likely . . . that the injury will be

11   redressed by a favorable decision."  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61

12   (1992) (internal quotation, citation, and alteration omitted).  "The party invoking federal

13   jurisdiction bears the burden of establishing" the elements of standing, see id. at 561, and

14   must make such a showing separately for each form of relief requested, see Friends of

15   the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc., 528 U.S. 167, 185 (2000).

16       Although there is, as Honda notes, "a split in authority among district courts in the

17   Ninth Circuit whether plaintiffs have Article III standing to bring claims for products they

18   did not personally purchase but that were purchased by unnamed class members," see

19   Cho v. Hyundai Motor Co., Ltd., 636 F. Supp. 3d 1149, 1179 (C.D. Cal. 2022), the

20   "prevailing view," which this Court follows, "is that class action plaintiffs can bring claims

21   for products they did not purchase as long as the products and alleged

22   misrepresentations are substantially similar," see id. at 1179-80 (internal quotation and

23   citation omitted).

24       Here, plaintiffs allege that all of the Class Vehicles are equipped with the same,

25   defective Infotainment System.  (See Opp. 5:13-14; see also SAC ¶ 106 (stating "[t]he

26   Infotainment System Defect alleged is inherent in, and the same for, all Class Vehicles").)

27   In particular, plaintiffs allege that the Class Vehicles' Infotainment Systems offer similar

28   features, including, inter alia, display screens (see SAC ¶¶ 93-96, 98, 101), USB,

United States District Court
Northern District of California

United States District Court
Northern District of California

Bluetooth, and/or Apple/Android connectivity (see SAC ¶¶ 93-94, 96-98, 101), multi-angle rear-view cameras (see SAC ¶¶ 95, 98-99, 100), and Honda's "Bluetooth Hands Free Link Interface" (see SAC ¶¶ 97, 98; see also SAC ¶ 101), that they "operate with and through substantially the same hardware, software, firmware, and operating system" (see SAC ¶ 102), and that they malfunction in similar ways (see, e.g., SAC ¶ 4 (alleging Infotainment System in Class Vehicles "malfunctions, freezes, or crashes, which in turn causes the inoperability of one or more features (including, inter alia, the navigation, heating, ventilation, and air conditioning ('HVAC'); music/radio; display screen; Bluetooth/phone; and backup camera functionalities"); ¶¶ 118-20 (listing complaints from Honda Civic, Accord, and CR-V owners regarding the above-referenced system failures)).

In addition, the SAC identifies multiple instances where Honda itself "grouped the CR-V along with the Civic in its communications regarding [the Infotainment System] Defect." (See Opp. 6:12-13.)  In particular, plaintiffs allege that, in two Technical Information & Support Group ("TISG") "priority action" communications to authorized dealers, Honda asked dealers to escalate any complaints from Civic or CR-V owners regarding specific Infotainment System failures so that Honda could "better understand the cause of th[e] condition."  (See SAC ¶ 147 (seeking complaints as to "the audio screen turning black, blank, or inop"); ¶ 148 (seeking complaints as to ""inop, blank, or black meter display[s] with no prior repairs").)

Under such circumstances, the Court finds plaintiffs have pled "sufficient similarity" among Class Vehicles.  Cf., e.g., Precht v. Kia Motors Am., Inc., 2014 WL 10988343, at *16 (C.D. Cal. Dec. 29, 2014) (finding plaintiff "fail[ed] to sufficiently allege that [d]efendant's representations and omissions about . . . [a] [b]rake [d]efect were similar for all of the Class Vehicles"; noting "besides the bald assertion that all the Class Vehicles contained the same defect, the [complaint] [did] not allege that anyone owning or leasing [vehicle models not purchased by plaintiff] actually experienced the [d]efect as [p]laintiff did," and that "the [complaint] generally lack[ed] specificity regarding [d]efendant's

1   representations about . . . [the] [b]rake [d]efect").

2       Accordingly, to the extent plaintiffs assert claims based on 2016 – 2020 Honda

3   CR-V's, such claims are not subject to dismissal for lack of standing.

4       **B. MMWA Claims (Fourteenth and Fifteenth Causes of Action)**

5       Plaintiffs assert, on behalf of themselves and on behalf of the Nationwide Class

6   and all sub-classes, claims for breach of express warranty and implied warranty,

7   respectively, under the MMWA.  (See SAC 94:2-5, 95:12-15; ¶¶ 405-427.)  Honda argues

8   plaintiffs' MMWA claims must be dismissed because there are fewer than 100 named

9   plaintiffs in this action.  In response, plaintiffs concede that they fail to meet the MMWA's

10  numerosity requirement for maintaining a class action, but contend they "may still pursue

11  MMWA claims individually."  (See Opp. 7:2-5.)

12      "The MMWA allows consumers to enforce written and implied warranties by

13  borrowing state law claims, meaning that a federal MMWA claim depends on the validity

14  of state law warranty claims."  See Weeks v. Google LLC, 2018 WL 3933398, at *10

15  (N.D. Cal. Aug. 16, 2018).  The MMWA's "text is clear that a requirement for an MMWA

16  class action in federal court is at least one hundred named plaintiffs."  See Floyd v. Am.

17  Honda Motor Co., 966 F.3d 1027, 1034 (9th Cir. 2020).

18      Here, the SAC names only six plaintiffs, and Honda thus is correct that plaintiffs

19  run afoul of MMWA's numerosity requirement.  Given that "[n]othing in the MMWA

20  prohibits [p]laintiffs from maintaining individual actions," however, see Sanchez v. Kia

21  Motors Am., Inc., 2021 WL 4816834, at *9 (C.D. Cal. Aug. 9, 2021), the Court will, for the

22  reasons set forth below, allow all but one of plaintiffs' MMWA implied warranty claims to

23  proceed on an individual basis, see Weeks, 2018 WL 3933398, at *9 (noting implied

24  warranty claim under MMWA "rises and falls with the other warranty claims before the

25  [c]ourt").

26      Accordingly, to the extent plaintiffs' MMWA claims are asserted on behalf of a

27  class, such claims are subject to dismissal; to the extent such claims are asserted on

28  behalf of the individual plaintiffs, however, only the MMWA claims for breach of express

warranty and one of the MMWA claims for breach of implied warranty are, as set forth below, subject to dismissal.

**C. Express Warranty Claims (Fourth, Sixth, and Twelfth Causes of Action)**

Plaintiffs assert three claims for breach of express warranty, all based on Honda's New Vehicle Lease Warranty ("NVLW"),[7] which, as noted above, covers new Honda vehicles "for 3 years or 36,000 miles, whichever comes first" (see Def.'s Request for Judicial Notice ("RJN") Exs. A-F, Dkt. Nos. 27-3, 27-4, 27-5, 27-6, 27-7, 27-8),[8] and provides, in relevant part, that "Honda will repair or replace any part that is defective in material or workmanship under normal use" (see RJN Exs. A-F).  Plaintiffs further allege they took their vehicles to a Honda dealership, which, in each instance, was unable to fix the alleged defect.  Based on such failure to fix the alleged defect, plaintiffs assert Honda, in violation of California, Maryland, and Virginia law, breached the express warranty.  (See SAC ¶¶ 228-235, 254-269, and 368-388.)[9]

Honda asserts that the NVLW, being limited by its terms to defects in "material or workmanship that are presented to a dealer for repair during defined time/mileage periods" (see Mot. 2:2-4), only covers manufacturing defects, as opposed to design defects, and that the SAC includes no facts to support a finding that the alleged defect is a manufacturing defect.  In response, plaintiffs argue they have "allege[d] the [d]efect is an issue of manufacturing, materials, or workmanship, in addition to design."  (See Opp.

---

[7] The Court does not address herein defendant's contention that the express warranty claims cannot be based on defendants' "generic representations [in advertisements] regarding 'enhancing safety'" (see Mot. 14:5), as the claims here are not based on any such representations (see SAC ¶¶ 231, 261, 375 (stating "[i]n a section entitled 'New Vehicle Limited Warranty,' [d]efendants' express warranty provides . . . ").)

[8] Honda's undisputed request that the Court take judicial notice of the warranty booklets for plaintiffs' vehicles is GRANTED.  See United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) (holding courts "may . . . consider . . . documents [deemed] incorporated by reference in the complaint . . . without coverting [a] motion to dismiss into a motion for summary judgment.").

[9] As noted above, the Ninth Cause of Action, namely, a claim alleging Breach of Express Warranty under Michigan law, has been withdrawn.  (See Opp. 11 n.3; SAC ¶¶ 307-327.)

7:20-21).

Under California law, a warranty that provides protection against "defects in materials or workmanship" does not cover design defects.  See Troup v. Toyota Motor Corp., 545 Fed. Appx. 668, 668 (9th Cir. 2013) (noting, "[i]n California, express warranties covering defects in materials and workmanship exclude defects in design").[10] A "design defect" exists "when the product is built in accordance with its intended specifications, but the design itself is inherently defective."  See McCabe v. American Honda Motor Co., 100 Cal. App. 4th 1111, 1120 (2002).  By contrast, a "manufacturing defect exists when an item is produced in a substandard condition," see id., i.e., where a manufacturer "fail[s] to comply with its own design specifications," see Lewis v. Am. Hoist & Derrick Co., 20 Cal. App. 3d 570, 580 (Ct. App. 1971), and is "often demonstrated by showing the product performed differently from other ostensibly identical units of the same product line," see McCabe, 100 Cal. App. 4th at 1120; see also Barker v. Lull Eng'g Co., 20 Cal. 3d 413, 429 (1978) (holding "when a product comes off the assembly line in a substandard condition it has incurred a manufacturing defect").

Here, as Honda points out, plaintiffs repeatedly allege, in a conclusory fashion, that the claimed defect is one in material and/or workmanship, but include no facts to support such conclusory assertions.  (See, e.g., SAC ¶¶ 142, 171.)  As Honda further notes, "simply using the words 'manufacturing,' 'materials,' and 'workmanship' does not somehow transform the crux of [p]laintiffs' design defect theory" (see Reply 5:11-12), and as discussed above, courts are not "bound to accept as true a legal conclusion couched as a factual allegation."  See Iqbal, 556 U.S. at 678 (internal quotation and citation

_____

[10] The same appears to be true under Virginia law.  See Flores v. FCA US LLC, 2021 WL 1122216, at *9 (E.D. Mich. Mar. 24, 2021) (dismissing express warranty claim based on Virginia law; noting complaint lacked "any well-pleaded supporting factual allegations that would support a claim of defects in materials or workmanship").  Although Maryland courts have not addressed the issue, "the overwhelming weight of state law authority holds that design defects are not covered under similar warranties," see Sloan v. Gen. Motors, LLC, 2017 WL 3283998, at *8 (N.D. Cal. Aug. 1, 2017), and the Court thus will apply the same rule to plaintiffs' claims under Maryland law.

United States District Court
Northern District of California

United States District Court
Northern District of California

omitted).  Further, to the extent the SAC includes facts pertaining to the type of alleged

defect, those facts would appear to support a finding that such defect is one of design.  In

particular, in bringing the action on behalf of a proposed class of "[a]ll persons and

entities . . . who purchased or leased a Class Vehicle" (see SAC ¶ 180 (emphasis

added)), plaintiffs are, in essence, acknowledging the Subject Vehicles do not perform

"differently from other ostensibly identical units of the same product line," see McCabe,

100 Cal. App. 4th at 1120, a fact evidencing, albeit not invariably demonstrating, a design

rather than manufacturing defect, see, e.g., Rollolazo v. BMW of N. Am., LLC, 2017 WL

6888501, at *8 (C.D. Cal. May 2, 2017) (holding "[w]here a defect is common to all

vehicles, such defect is typically considered one of design, rather than a manufacturing

defect").

Plaintiffs argue the type of defect alleged in the SAC, namely, "'improperly

designed and/or programmed/calibrated software,'" is "per se a manufacturing defect."

(See Opp. 8:19-21 (quoting SAC ¶¶ 4, 105).)  The cases on which plaintiffs rely,

however, establish no such per se rule, see Browning v. Am. Honda Motor Co., 2022 WL

824106, at *9 (N.D. Cal. Mar. 18, 2022) (denying motion to dismiss breach of express

warranty claim; finding alleged software calibration defect, "as pled," constituted

manufacturing defect); Morris v. BMW of N. Am., LLC, 2014 WL 793550, at *11 (D.N.J.

Feb. 26, 2014) (denying motion to dismiss breach of express warranty claims; noting

"[w]hether the alleged defect in the [n]avigation [s]ystem is caused by defective hardware

or software, a design defect or a defect in 'materials or workmanship' remains to be

seen"), and indeed, at least one court has found an alleged software defect constitutes a

design defect, see Dack v. Volkswagen Grp. of Am., 565 F. Supp. 3d 1135, 1147 (W.D.

Mo. 2021) (finding alleged software coding defect constituted design defect where

complaint "only state[d] there is a software coding defect which causes the brakes to

engage unexpectedly"; finding "insertion of the word 'manufacturing' at various places in

the complaint [was] insufficient to survive a motion to dismiss" (internal quotation, citation,

and alteration omitted)).

13

In sum, whether a programming or calibration defect is part of the specifications or constitutes a deviation from the specifications is what distinguishes a design defect from a manufacturing defect.  Here, as noted, the SAC contains no factual allegations pertaining to that distinction, and speculating that the defect "may be a software calibration issue that was introduced during manufacture" (see Opp. 9:28-10:1) does not suffice, see Twombly, 550 U.S. at 555 (holding "[f]actual allegations must be enough to raise a right to relief above the speculative level").

Accordingly, plaintiffs' express warranty claims are subject to dismissal. [11]

### D. Implied Warranty Claims (Third, Seventh, Tenth, and Thirteenth Causes of Action)

Plaintiffs allege that Honda, in violation of California, Maryland, Michigan, and Virginia law, breached the implied warranty of merchantability.

Under California law, "every sale of consumer goods that are sold at retail in [California] shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable."  See Cal. Civ. Code § 1792.  Similarly, under Maryland, Michigan, and Viginia law, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  See Md. Code Ann., Com. Law § 2-314(1); Mich. Comp. Laws Ann. § 440.2314(1); Va. Code Ann. § 8.2-314(1).  Under California, Maryland, Michigan, and Virginia law, the term "merchantability" is defined as "fit for the ordinary purposes for which such goods are used."  See Cal. Civ. Code § 1791.1(a); Md. Code Ann., Com. Law § 2-314(2); Mich. Comp. Laws Ann. § 440.2314(2); Va. Code Ann. § 8.2-314(2).

According to plaintiffs, Honda breached the implied warranty of merchantability because "the Class Vehicles and their Infotainment Systems are not fit for their ordinary purpose of providing reasonably reliable and safe transportation."  (See SAC ¶¶ 222,

---

[11] In light of the above finding, the Court does not address herein defendant's alternative arguments in support of dismissal of plaintiffs' express warranty claims.

United States District Court
Northern District of California

335, 396; see also SAC ¶ 277.)

Honda argues plaintiffs' implied warranty claims must be dismissed for three reasons: (1) the alleged Infotainment System Defect does not render the Class Vehicles unmerchantable; (2) plaintiff Meisel's used car purchase cannot give rise to a claim for breach of implied warranty under California law; and (3) the time limitation of the NVLW forecloses plaintiff Montgomery's implied warranty claim.[12]  The Court addresses each argument in turn.

### 1. Unmerchantable

Honda argues the alleged Infotainment System Defect does not render plaintiffs' vehicles unfit for transportation, which, it asserts, is the ordinary purpose for which one uses a vehicle.  In response, plaintiffs acknowledge their vehicles can be driven but contend the defect makes such driving unsafe.

Under California law, as interpreted by the Ninth Circuit, a plaintiff can establish a claim for breach of the implied warranty of merchantability not only by showing the defect renders the vehicle "inoperable" but, alternatively, by showing the defect "compromise[s] the vehicle's safety."  See Troup, 545 Fed. Appx. at 669; see also Isip v. Mercedes-Benz USA, LLC, 155 Cal. App. 4th 19, 27 (2007) (approving jury instruction "[d]efining the [implied] warranty in terms of a vehicle that is 'in safe condition and substantially free of defects'"; finding such instruction "consistent with the notion that the vehicle is fit for the ordinary purpose for which a vehicle is used").

Here, plaintiffs allege the Infotainment System Defect "causes the back-up camera image and the display image to flicker, freeze, and/or fail, error messages . . . , the display screen and all associated functionalities to crash, Bluetooth connections to fail, USB connections to fail, the inability to receive incoming calls or make outgoing calls, the failure of in-vehicle microphone function, the navigation to fail, and GPS signal failure."

---

[12] To the extent Honda argues Meisel's and Kreidel's warranties "likely" expired at the time they presented their cars to the dealer (see Mot. 18:20-22), such conjecture is not grounds for dismissal.

United States District Court
Northern District of California

(See SAC ¶ 6.)  Plaintiffs further allege that the Infotainment System defect "prevents the driver from being able to adjust the HVAC system; . . . causes the display screen to fail and suddenly go blank, black, or blue, which can cause the driver to become distracted, and it causes safety-related systems (including backup camera functions) to fail[.]"  (See SAC ¶ 6.)

Consistent therewith, plaintiffs quote from over forty consumer complaints filed with the NHTSA by persons who own Class Vehicles, asserting, for example, (1) "[a]s a consequence [of the infotainment display screen malfunction], my rear view, and right side view cameras no longer show on the display screen," such that "I cannot see if other vehicles are in the right lane when I am planning to change to the right lane, or planning to make a right turn"; (2) "audio system will intermittently disable sound output on all channels . . . [;] car audio amplifier over heating[;] temperature measured at 197 degrees f. risk of fire"; (3) "[w]hen selecting Reverse, the rearview camera . . . sometimes takes several seconds to display, or doesn't display at all," which delay "detracts from my ability to reverse safely"; (4) "back up camera is fuzzy with very low resolution . . . [which] may cause serious injury"; (5) "when this defective infotainment system crashes, it causes the driver to think something bad is happening to the car and driver will be very distracted"; (6) "when the windshield fogs and you can't use the defrost system it becomes a visibility issue"; (7) "[w]hile driving, when using the radio or GPS, the display on the center console will intermittently go haywire; [d]isplay will turn on and off, loudly beep, screen will go blank and then turn back on unexpectedly, brightness adjustment bar appears on screen . . . [v]ery distracting and dangerous while driving."  (See SAC ¶ 120.)

Honda argues plaintiffs' continued use of their vehicles after experiencing the Infotainment System Defect undermines their claims of unmerchantability.  Plaintiffs, however, cite to several cases squarely rejecting such argument, and the Court is persuaded by the reasoning therein.  See, e.g., Isip, 155 Cal.App.4th at 27 (holding "[w]e reject the notion that merely because a vehicle provides transportation from point A to point B, it necessarily does not violate the implied warranty of merchantability"); Granillo

1   v. FCA US LLC, 2016 WL 9405772, at *10 (D.N.J. Aug. 29, 2016) (holding "the mere fact

2   that a plaintiff continues to drive her allegedly defective vehicle, does not mean that the

3   vehicle is in safe condition, is substantially free of defects, or that it can provide reliable

4   transportation").

5         Likewise unavailing is Honda's argument that Infotainment Systems "are not

6   necessary for the safe drivability of [a] car."  (See Mot. 17:3-4.)  Although, as Honda

7   notes, there was a time when "cars [did] not [have] large center screens" (see Mot. 7:4),

8   the Court agrees with plaintiffs that "[c]omparing vehicles without Infotainment Systems . .

9   . to [p]laintiffs' Class Vehicles with broken Infotainment Systems that lead to driver

10  distraction and dangerously inaccurate or blank backup camera images is a false

11  equivalence" (see Opp. 15:18-21 (emphasis omitted)).  Similarly, to the extent Honda

12  asserts defective backup cameras cannot render vehicles unmerchantable because such

13  cameras were not required by the NHTSA until 2018, i.e., after all but one of the named

14  plaintiffs purchased their vehicles, and that drivers "[f]or decades . . . have backed up

15  their cars by using their mirrors and turning around to see if something or someone is

16  behind them" (see Mot. 17:15-24), the Court agrees with plaintiff that such arguments

17  "suffer from the same logical fallacies" discussed above (see Opp. 16:8).[13]

18        Under such circumstances, the Court finds the above-cited factual allegations are

19  sufficient to support a finding that the alleged defect compromises plaintiffs' ability to

20  operate their respective vehicles safely, and, consequently, that plaintiffs have sufficiently

21  pled unmerchantability.

22        **2.  Meisel's claim**

23        Honda next contends plaintiff Meisel's purchase of a used Honda Civic from a

24  Honda dealer cannot give rise to an implied warranty claim under California law.

25  _____

26        [13] Honda's remaining arguments, namely, (1) that Honda's authorized dealerships
    fixed the Infotainment System Defect in plaintiffs' vehicles or determined the vehicles

27  were operating normally (see Mot. 16:26-17:1), and (2) that plaintiffs have not alleged
    any out-of-pocket costs for any malfunctions after the warranty period (see Mot. 17:1-3),

28  are premature at this stage of the proceedings.

California's Song-Beverly Act provides that "every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable." See Cal. Civ. Code. § 1792. "Consumer goods" are defined as "any new product or part thereof that is used, bought, or leased for use primarily for personal, family, or household purposes, except for clothing and consumables." See Cal. Civ. Code § 1791(a). Section 1795.5, however, extends the Act to used goods, and provides that "[i]t shall be the obligation of the distributor or retail seller making express warranties with respect to used consumer goods (and not the original manufacturer, distributor, or retail seller making express warranties with respect to such goods when new) to maintain sufficient service and repair facilities within the state to carry out the terms of such express warranties." See Cal. Civ. Code § 1795.5(a). Section 1795.5 further states that "[t]he duration of the implied warranty of merchantability . . . , where the sale is accompanied by an express warranty, shall be coextensive in duration with an express warranty which accompanies the consumer goods[.]" See Cal Civ. Code. § 1795.5(c). In other words, "only distributors or sellers of used goods—not manufacturers of new goods—have implied warranty obligations in the sale of used goods." See Nunez v. FCA US LLC, 61 Cal. App. 5th 385, 399 (2021); see also Kiluk v. Mercedes-Benz USA, LLC, 43 Cal.App.5th 334, 339 (2019) (holding "[t]he Song-Beverly Act provides similar remedies in the context of the sale of used goods, except that the manufacturer is generally off the hook"); In re MyFord Touch Consumer Litig., 291 F. Supp. 3d 936, 950 (N.D. Cal. 2018) (holding § 1795.5 "does not create additional obligations on a manufacturer vis-à-vis used car purchasers; rather, it simply states that the retailer or distributor is also subject to whatever obligations already apply to the manufacturer" (emphasis omitted)).

Here, plaintiffs allege Meisel "purchased a used 2016 Honda Civic with approximately 26,237 miles on the odometer from Galpin Honda, an authorized Honda dealership in San Fernando, California." (See SAC ¶ 29.) Honda, citing cases interpreting § 1795.5 of the Act, argues it is exempt from liability for breach of the implied

1   warranty of merchantability based on its role as manufacturer, rather than retailer or

2   distributor, of Meisel's used car.  Plaintiffs contend § 1795.5 is inapplicable to Meisel's

3   claim because his vehicle qualifies as a new car under another provision of the Song-

4   Beverly Act, namely, § 1793.22.

5        Under § 1793.22, new or used cars "sold with a balance remaining on the

6   manufacturer's new motor vehicle warranty are included within [the] definition of 'new

7   motor vehicle.'"  See Jensen v. BMW of N. Am., Inc., 35 Cal. App. 4th 112, 123 (1995),

8   as modified on denial of reh'g (June 22, 1995); see also Cal. Civ. Code § 1793.22(e).

9        Here, although plaintiffs argue Meisel's vehicle "was sold with a balance of an[ ]

10  express warranty" from Honda (see Opp. 17:9), they have failed to plead sufficient facts

11  to that effect.  In particular, although plaintiffs allege the car had "approximately 26,237

12  miles on the odometer" at the time of purchase (see SAC ¶ 29), they do not specify the

13  date on which the car was first purchased, i.e., the date on which the three-year warranty

14  period began to run.  In any event, the definition of "new motor vehicle" under §

15  1793.22(e) only applies to two sections, namely, § 1793.2(d), which courts have found

16  "only applies to express warranties," see Victorino v. FCA US LLC, 326 F.R.D. 282, 301

17  (S.D. Cal. 2018), and to § 1793.22, which does not reference implied warranties, see id.;

18  see also Leber v. DKD of Davis, Inc., 237 Cal. App. 4th 402, 409 (2015) (noting "[i]f the

19  Legislature had intended the definition of 'new' vehicle in section 1793.22, subdivision (e)

20  to apply throughout the Act, it would not have explicitly limited its applicability").

21        Plaintiffs alternatively argue they have pled that Honda is a distributor of used

22  cars, "thus bringing . . . Meisel squarely under Section 1795.5's protection as against

23  [Honda]."  (See Opp. 17:12-13.)  Plaintiffs have not, however, cited any authority holding

24  an automobile manufacturer liable under § 1795.5's used vehicle provision based on

25  used vehicle sales made by its authorized dealerships, nor have plaintiffs pleaded any

26  facts in support of the above-referenced conclusory allegation, namely, facts establishing

27  Honda's status as a "retailer" or "distributor" of used vehicles.  See Herrera v.

28  Volkswagen Grp. of Am., Inc., 2016 WL 10000085, at *5 (C.D. Cal. Sept. 9, 2016)

United States District Court
Northern District of California

1   (noting, for purposes of pleading claim under § 1795.5, plaintiffs "must plead sufficient

2   facts leading to the inference that [d]efendant is either a distributor or a retail seller of

3   used cars"); <u>Lemke-Vega v. Mercedes-Benz USA, LLC</u>, 2023 WL 3604318, at *1 (N.D.

4   Cal. May 22, 2023) (granting manufacturer's motion to dismiss Song-Beverly Act claim

5   asserted by used car buyer; noting complaint "d[id] not allege facts to support a

6   reasonable inference that [defendant manufacturer] stepped into the role of retailer"

7   (internal quotation and citation omitted)).

8          Under such circumstances, the Court finds the allegations in the SAC insufficient

9   to support Meisel's implied warranty claim.

10          **3. Montgomery's claim**

11          Lastly, Honda argues, plaintiff Montgomery's implied warranty claim under

12   Michigan law fails because the NVLW had already expired when he allegedly

13   experienced the Infotainment System Defect.  In response, plaintiffs argue the durational

14   limit of an express warranty cannot bar an implied warranty claim where, as here,

15   "[p]laintiffs have alleged a uniform, latent defect rendering the vehicles unmerchantable,

16   <u>i.e.</u>, the breach occurred at the time of [p]laintiffs' purchase."  (<u>See</u> Opp. 17:20-22).

17          Under Michigan law, if the complaint alleges the subject products "were never fit

18   for their ordinary purpose, . . . the question of whether a defect manifested within the

19   warranty period does not arise."  <u>See</u> <u>Chapman v. Gen. Motors LLC</u>, 531 F. Supp. 3d

20   1257, 1278 (E.D. Mich. 2021) (declining to dismiss Michigan implied warranty claim

21   although outside limits of express warranty; noting plaintiffs "reference[d] a uniform

22   defect" in design, essentially, one that existed at the time of purchase) (internal quotation

23   and citation omitted).

24          Here, as discussed above, plaintiffs have plausibly alleged a defect in the design

25   of the Infotainment Systems in the Class Vehicles, <u>i.e.</u>, one that existed at the time of

26   plaintiffs' purchase, and that such defect rendered the Class Vehicles unsafe for their

27   ordinary purpose.  Consequently, the fact that the alleged defect was not discovered by

28   Montgomery within the duration of the NVLW is not determinative.

1    Under such circumstances, the Court finds the allegations in the SAC sufficient to

2    support Montgomery's implied warranty claim.[14]

3         **4.  Summary – Implied Warranty Claims**

4    Accordingly, with the exception of Meisel's claim under the Song-Beverly Act and

5    Beech and Kreidel's claims under Virginia law, the latter two individuals' claims being, for

6    the reasons set forth below, subject to dismissal as time-barred, plaintiffs' implied

7    warranty claims are not subject to dismissal.

8    **E.  Fraud Claims (First, Second, Fifth, Eighth, Eleventh, and Sixteenth Causes of**
     **Action)**

9

10    Plaintiffs assert one common law claim for "Fraud by Omission or Fraudulent

11    Concealment"[15] and five statutory fraud-based consumer protection claims, two under

12    California law, and one each under Maryland, Michigan, and Virginia law.

13    Under California law, "[a] claim for fraud based on concealment or omission

14    requires" a showing that: "(1) the defendant . . . concealed or suppressed a material fact;

15    (2) the defendant [was] under a duty to disclose the fact to the plaintiff; (3) the defendant

16    . . . intentionally concealed or suppressed the fact with intent to defraud the plaintiff; (4)

17    the plaintiff [was] unaware of the fact and would have acted otherwise if he had known of

18    the concealed or suppressed fact; and (5) as a result of the concealment or suppression

19    of the fact, the plaintiff sustained damage."  See In re Ford Motor Co. DPS6 Powershift

20    Transmission Prod. Liab. Lit., 2019 WL 6998668, at *6 (C.D. Cal. Sept. 5, 2019).  The

21    elements of fraud-based claims under the relevant state consumer protection statutes are

22    similar.  See Hammerling v. Google LLC, 615 F. Supp. 3d 1069, 1081 (N.D. Cal. 2022)

23

24    ───────────────

      [14] In light of this finding, the Court does not address herein plaintiffs' arguments
25    regarding unconscionability.

26    [15] As Honda points out, given that "[p]laintiffs do not invoke any specific [s]tate's
      law for their fraud claim, the presumption is that the law of the forum [s]tate (i.e.,
27    California) will apply."  (See Mot. 19:21-23); see also Gasperini v. Ctr. for Humanities,
      518 U.S. 415, 427 (1996) (holding "[u]nder the Erie doctrine, federal courts sitting in
28    diversity apply state substantive law and federal procedural law").

United States District Court
Northern District of California

(holding "[t]o allege a violation of [California's CLRA and UCL] based on a fraudulent misrepresentation or omission, a plaintiff must plead (1) misrepresentation or omission, (2) reliance, and (3) damages"); Clark v. Bank of Am., N.A., 561 F. Supp. 3d 542, 557 (D. Md. 2021) (holding, to state a claim under Maryland's Consumer Protection Act, "a plaintiff must allege (1) an unfair or deceptive practice that is (2) relied upon, and (3) causes them actual injury" (internal quotation, citation, and alteration omitted)); In re Packaged Seafood Prod. Antitrust Litig., 242 F. Supp. 3d 1033, 1076 (S.D. Cal. 2017) (holding, "[t]o validly plead a fraud-based cause of action under the [Michigan Consumer Protection Act], a plaintiff must plead with particularity that a defendant employed fraudulent and deceptive means with the intent to deceive," and that the plaintiff "relied on such deceptive conduct when making a purchase" (internal quotation, citation, and alteration omitted)); Bank of Montreal v. Signet Bank, 193 F.3d 818, 827 (4th Cir. 1999) (holding "in all cases of fraud [under Virginia law] the plaintiff must prove that it acted to its detriment in actual and justifiable reliance on the defendant's misrepresentation (or on the assumption that the concealed fact does not exist)").

"[T]here are four circumstances in which an obligation to disclose may arise: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." Asghari v. Volkswagen Grp. of Am., Inc., 42 F. Supp. 3d 1306, 1328 (C.D. Cal. 2013).[16]

---

[16] Under Michigan, Virginia, and Maryland law, a duty to disclose arises under essentially the same circumstances. See In re Nat'l Prescription Opiate Litig., 458 F. Supp. 3d 665, 700 (N.D. Ohio 2020) (holding "Michigan law imposes . . . a duty to disclose in circumstances involving fiduciary or other special relationships involving significant trust or a substantial imbalance of knowledge of power"); Simpson v. Champion Petfoods USA, Inc., 397 F. Supp. 3d 952, 971 (E.D. Ky. 2019) (holding "[a] duty to disclose may arise under Virginia law in the following situations: (1) if the fact is material and the one concealing has superior knowledge and knows the other is acting upon the assumption that the fact does not exist; (2) if one party takes actions which divert the other party from making prudent investigations (e.g., by making a partial disclosure) . . . ; or (3) if some fiduciary or confidential relationship exists between the parties" (internal quotations, citations, and alterations omitted)); Est. of White ex rel.

United States District Court
Northern District of California

1   Honda argues plaintiffs' fraud claims must be dismissed for three asserted

2   reasons: (1) "the SAC contains insufficient allegations to establish [Honda's] knowledge

3   of a 'defect' prior to plaintiffs' vehicle purchases" (see Mot. 19:4-5); "plaintiffs fail to plead

4   an actionable misrepresentation or reliance on a misrepresentation or omission" (see

5   Mot. 22:11-12); and (3) plaintiffs "plead no facts to show [Honda] actively concealed

6   anything" (see Mot. 23:7-8).  The Court takes each argument in turn.

7       **1. Knowledge**

8   Honda contends that each of plaintiffs' fraud claims is subject to dismissal for

9   failure to plead Honda's knowledge of the alleged defect.

10   To succeed on any of the above-referenced fraud claims, plaintiffs must allege

11   Honda's knowledge of the Infotainment System Defect at the time of their purchases.

12   See Wilson v. Hewlett-Packard Co., 668 F.3d 1136, 1145 (9th Cir. 2012) (holding, for

13   purposes of California CLRA and UCL claims, "plaintiffs must sufficiently allege that . . .

14   defendant was aware of the defect at the time of sale"); see also Wozniak v. Ford Motor

15   Co., 2019 WL 108845, at *3 n.5 (E.D. Mich. Jan. 4, 2019) (noting California, Maryland,

16   Michigan, and Virginia consumer protection laws "require[ ] knowledge of the defect by

17   the defendant, or at least that the defendant should have known of the defect through

18   reasonable inquiry"); Falk v. Gen. Motors Corp., 496 F. Supp. 2d 1088, 1099 (N.D. Cal.

19   2007) (noting "nondisclosure" and "knowledge of falsity" are elements of fraud by

20   omission under California law).

21   Here, plaintiffs allege, Honda "has superior and/or exclusive knowledge of material

22   facts regarding the Infotainment System Defect" based on "pre-production testing, design

23   failure mode analysis, aggregate part sales, consumer complaints about the [Infotainment

24   System] Defect to [Honda's] dealers, . . . consumer complaints made directly to Honda,

25

26   ─────────────────

27   White v. R.J. Reynolds Tobacco Co., 109 F. Supp. 2d 424, 431 (D. Md. 2000) (holding, under Maryland law, "[a] duty to speak arises when one party is in a fiduciary or confidential relationship with the other. . . and at times when one party makes a partial and fragmentary statement of fact" (internal quotation and citation omitted)).

28

1   dealer audits, aggregate warranty information, consumer complaints to and resulting

2   notice from NHTSA, early consumer complaints on websites and internet forums,

3   dealership repair orders, among other internal sources of information about the problem."

4   (See SAC ¶ 11.)

5       Honda argues such "omnibus allegations do not demonstrate [its] knowledge of

6   any defect."  (See Mot. 20:8.)  Although the Court agrees that such allegations are

7   conclusory, and do not, standing alone, establish knowledge, see Grodzitsky v. Am.

8   Honda Motor Co., 2013 WL 690822, at *6 (C.D. Cal. Feb. 19, 2013) (finding plaintiffs'

9   "generalized assertion that unspecified 'pre-release testing data' and 'aggregate data

10  from Honda dealers' fail[ed] to suggest how [such] information could have informed

11  [Honda] of the alleged defect at time of sale"), the SAC contains specific factual

12  allegations that, taken as true, support a plausible inference that Honda was aware of the

13  alleged Infotainment System Defect at the time it sold the Subject Vehicles to plaintiffs.

14      In particular, plaintiffs allege that Honda, "as part of [its] ongoing obligation to

15  identify potential defects" in its vehicles, "monitor[s] NHTSA databases for consumer

16  complaints regarding [its] automobiles" (see SAC ¶ 117) and, as noted above, list in the

17  SAC over forty examples of such complaints regarding the Infotainment System Defect,

18  several of which were made well before plaintiffs purchased the Subject Vehicles (see

19  SAC ¶¶ 118-120).  Similarly, plaintiffs allege that Honda "routinely monitor[s]" various

20  third-party websites dedicated to the Class Vehicles "as a part of brand management"

21  (see SAC ¶ 121), and list in the SAC excerpts of fifteen complaints regarding the

22  Infotainment System Defect posted on such websites (see SAC ¶¶ 122-136), several of

23  which suggest the complainants had previously discussed the substance of their

24  complaint with a Honda dealer, or Honda itself (see SAC ¶¶ 122-124, 130).

25      Taken together, these allegations support a plausible inference that Honda saw

26  and reviewed the specific complaints that were made about the Infotainment System

27  Defect.  See, e.g., Grodzitsky v. Am. Honda Motor Co., 2013 WL 2631326, at *6 (C.D.

28  Cal. June 12, 2013) (holding plaintiff sufficiently pled Honda was aware of window

24

1  regulator defect where plaintiffs "allege[d] that Honda monitored NHTSA databases" and

2  "list[ed] a 'sampling' of complaints made to the NHTSA" regarding such defect); Cirulli v.

3  Hyundai Motor Co., 2009 WL 5788762, at *4 (C.D. Cal. June 12, 2009) (holding plaintiff

4  had sufficiently pled Hyundai was aware that vehicles were unusually vulnerable to

5  premature oxidation and corrosion, and consequent structural deterioration, where

6  plaintiff alleged that "[s]ince 1999, [defendant] ha[d] constantly tracked the [NHTSA]

7  database to track reports of defective Sonata subframes," and that "[f]rom this source, . . .

8  knew that its 1999-2004 Sonatas were experiencing unusually high levels of sub-frame

9  deterioration, steering control arm separation, steering loss, and highway accidents"

10  (internal quotation, citation, and alterations omitted)).

11       Moreover, the SAC contains numerous additional allegations regarding Honda's

12  communications with dealers and customers that, together with the above-referenced

13  customer complaints, bolster plaintiffs' allegation that Honda was aware of the

14  Infotainment System Defect at the time that the Subject Vehicles were sold.  In that

15  regard, plaintiffs allege Honda, in 2014, began a "Customer Satisfaction Campaign"

16  targeted at 2013 Honda Accord owners and lessees, "asking them to visit 'any authorized

17  Honda dealer' for free repair to the 'software for your audio or audio-navigation unit' in

18  order to address 'known audio, HandsFreeLink, and navigation system bugs.'"  (See SAC

19  ¶ 143).

20       Plaintiffs further allege Honda has issued multiple TSBs identifying, and

21  prescribing repairs for, common issues with the Class Vehicles' infotainment systems,

22  namely, TSB 18-001, which was issued in February 2018 "to correct 'a problem with the

23  audio/audio-navigation unit software'" and recommended "'updat[ing] the audio unit

24  software using the audio-navigation system update device'" (see SAC ¶ 144),

25  TSB-20-23-001 Version 2, which was issued in June 2018 to address the same concerns

26  identified in TSB 18-001 with "updated . . . repair procedure images" (see SAC ¶ 144),

27  and TSB 20-889, which was issued in October 2020 to "correct a problem with the

28  software that would result in the Bluetooth system and Infotainment System display

United States District Court
Northern District of California

'freezing'" and recommended "'updat[ing] the audio unit software'" (see SAC ¶ 145).

Plaintiffs also allege Honda has issued multiple Technical Information & Support Group ("TISG") priority action communications, which communications ask dealers to share with Honda consumer complaints about various manifestations of the Infotainment System Defect (see SAC ¶ 146 (noting TISG No. 10186018-001, issued January 22, 2021, sought information from dealers regarding "'certain 2016-2020 Civics with a customer complaint of the rear-view camera screen appearing blank, foggy or blurry"); ¶ 147 (noting TISG No. 10202268-001, issued October 1, 2021, sought information from dealers regarding "'certain 2019-2020 Civics (2dr or 4dr) & CR-Vs with a customer complaint of the audio screen turning black, blank or inop"); ¶ 148 (noting TISG No. 10210077-001, issued March 23, 2022, sought information from dealers regarding "'certain 2017-2018 Civic & CR-Vs with a customer complaint of an inop, blank, or black meter display with no prior repairs").

Honda argues that the above allegations fail to establish its pre-sale knowledge of the alleged Infotainment System Defect, in that the majority of the complaints, TSBs, and TISGs identified therein post-date plaintiffs' vehicle purchases.  The Court, for the reasons set forth below, is not persuaded.

First, with respect to the timing of customer complaints, plaintiffs need not allege "an unusually high level of pre-sale complaints to survive a motion to dismiss."  See Parrish v. Volkswagen Grp. Of Am., Inc., 463 F. Supp. 3d 1043, 1052 (C.D. Cal. 2020) (internal quotation and citation omitted).  Here, as noted above, plaintiffs Beech, Meisel, and Chiulli purchased Honda Civics on or about September 4, 2017, September 26, 2018, and May 27, 2019, respectively.  Thus, at least three of the customer complaints regarding Civics alleged in the SAC pre-dated Beech's purchase (see SAC ¶¶ 118(l), 118(p), 118(q)),[17] at least four complaints pre-dated Meisel's purchase (see SAC

---

[17] Although the SAC references an additional customer complaint regarding a Honda Civic posted on November 22, 2015, prior to Beech, Meisel, and Chiulli's purchases, said complaint appeared on a third-party website apparently devoted to Honda Accords, namely, "driveaccord.net," and, consequently, the Court has not

United States District Court
Northern District of California

¶¶ 118(k)[18], 118(l), 118(p), 118(q)), and at least five complaints pre-dated Chiulli's purchase (see SAC ¶¶ 118(j), 118(k)[19], 118(l), 118(p), 118(q)).  Plaintiffs Kreidel, Susseles, and Montgomery purchased Honda Accords on March 18, 2017, October 5, 2019, and June 26, 2021, respectively.  Thus, at least two of the customer complaints regarding Accords pre-dated Kreidel's purchase (see SAC ¶¶ 130, 132), at least six complaints pre-dated Susseles' purchase (see SAC ¶¶ 119(a), 119(b), 119(e), 119(o), 130, 132), and at least fifteen pre-dated Montgomery's purchase (see SAC ¶¶ 119(a), 119(b), 119(e), 119(f), 119(g), 119(h), 119(i), 119(l), 119(m), 119(n), 119(o), 128, 130, 131, 132).  Under such circumstances, the Court finds the number of pre-sale complaints asserted in the SAC sufficient to establish Honda's knowledge of the Infotainment System Defect.  See Parrish, 463 F. Supp. 3d at 1052 (noting district courts in this circuit "have held that two or three pre-sale complaints were sufficient"); see also Myers v. BMW of N. Am., LLC, 2016 WL 5897740, at *4 (N.D. Cal. Oct. 11, 2016) (finding allegations sufficient where "two of the[ ] complaints [were] dated prior to the time [plaintiff] must have purchased her car"); cf. Wilson, 668 F.3d at 1148 (finding twelve undated complaints and two complaints that post-dated plaintiff's purchase by at least two years "d[id] not support an inference that [defendant] was aware of the defect at the time it sold the [product] to [p]laintiffs").

Next, with respect to the timing of Honda's communications to dealers, e.g., TSBs, multiple courts have held it reasonable to infer that the issuance of a TSB follows a manufacturer's awareness of a defect.  See, e.g., Falco v. Nissan N. Am., Inc., 2013 WL

---

considered it in determining whether Honda had notice of the Infotainment System Defect in Civics prior to plaintiffs' purchases.  (See SAC ¶ 129.)

[18] Paragraph 118(k) summarizes two complaints, one filed January 29, 2018, and one filed September 30, 2018.  The Court assumes, for purposes of this order, that Honda, at the time of Meisel's purchase, had notice only of the earlier of those two complaints.

[19] The Court assumes Honda, at the time of Chiulli's purchase, had notice of both complaints alleged in ¶ 118(k).

United States District Court
Northern District of California

5575065, at *6–7 (C.D. Cal. Oct. 10, 2013) (stating, where defendant issued first of several TSBs in July 2007, such event "permit[ted] plausible inferences that [defendant] was aware of the defect at the time they sold the vehicles in 2005 and 2006"); <u>Philips v. Ford Motor Co.</u>, 2015 WL 4111448, at *9 (N.D. Cal. July 7, 2015) (finding TSB issued in 2011 plausibly established defendant's knowledge of defect in car purchased by plaintiff in 2010).

Here, as noted above, two of the TSBs alleged in the SAC were issued in February 2018 and June 2018, respectively.  (<u>See</u> SAC ¶¶ 144-145).  Under such circumstances, plaintiffs have alleged sufficient facts to permit an inference that Honda was aware of the Infotainment System Defect as early as 2016, <u>i.e.</u>, the start of the putative class period.  <u>See</u> <u>Falco</u>, 2013 WL 5575065, at *6-7.[20]

Under such circumstances, the Court finds plaintiffs have plausibly established Honda's knowledge of the Infotainment System Defect at the time of plaintiffs' purchases.

## 2.  Misrepresentation and Reliance

Honda next contends plaintiffs' fraud claims are subject to dismissal for failure to plead, as required by Rule 9(b) of the Federal Rules of Civil Procedure, an actionable misrepresentation or omission, let alone plaintiffs' reliance thereon.  <u>See</u> Fed. R. Civ. P. 9(b) (requiring parties to "state with particularity the circumstances constituting fraud or mistake").  The Court disagrees.

---

[20] To the extent Honda argues its communications to dealers in TSBs/TSIGs cannot establish knowledge because they concerned different models and/or model years than those purchased by plaintiffs, such argument likewise is unavailing.  As discussed above with respect to the warranty claims, plaintiffs allege all of the Class Vehicles had the same Infotainment System Defect.  <u>See</u>, <u>e.g.</u>, <u>Parrish</u>, 463 F.Supp.3d 1056 (characterizing difference as immaterial where "the [Technical Services Bulletin] addressed only Jetta vehicles while some [p]laintiffs ha[d] Tiguan vehicles because [p]laintiffs allege[d] both models had the same [d]efect with the same [t]ransmission"); <u>MacDonald v. Ford Motor Co.</u>, 37 F. Supp. 3d 1087, 1093 (N.D. Cal. 2014) (holding "[a]lthough the first TSB related only to the 2005 Ford Escape Hybrids, it is plausible that Ford knew of the defect in other model years because [p]laintiffs allege the allegedly defective part in their vehicles is the same").

United States District Court
Northern District of California

United States District Court
Northern District of California

First, to the extent Honda asserts plaintiffs fail to plead an actionable misrepresentation, such argument overlooks the theory and factual allegations underlying plaintiffs' fraud claims, namely, that Honda failed to disclose or actively concealed from plaintiffs the alleged Infotainment System Defect before plaintiffs purchased their vehicles.  (See SAC ¶¶ 2, 9, 13, 107, 152, 156, 197, 211, 246, 299, 361, 431, 434.)

Second, to the extent Honda asserts plaintiffs have failed to plead their reliance on Honda's failure to disclose the Infotainment System Defect, such argument is, as set forth below, unpersuasive.

A plaintiff can demonstrate reliance "by simply proving that, had the omitted information been disclosed, one would have been aware of it and behaved differently." See Daniel v. Ford Motor Co., 806 F.3d 1217, 1225 (9th Cir. 2015) (internal quotation and citation omitted); see also id. (holding "[a] plaintiff need not prove that the omission was the only cause or even the predominant cause, only that it was a substantial factor in his decision").

Here, plaintiffs allege that (1) Honda "was aware of material facts regarding the Infotainment System Defect but failed to disclose them to consumers" (see SAC ¶ 107); (2) plaintiffs researched the vehicles,[21] test drove them, and/or discussed their safety features with dealership employees prior to making their purchases (see SAC ¶¶ 20, 31, 42, 52, 61, 70); and (3) "[h]ad [Honda] disclosed the Infotainment System Defect, [p]laintiffs . . . would not have purchased the Class Vehicles, would have paid less for them, or would have required [Honda] to replace, or pay for the replacement of, the defective Infotainment System with a non-defective version before their warranty period expired" (see SAC ¶ 16; see also ¶¶ 21, 32, 43, 53, 62, 71).  At the pleading stage, "[t]hese representations satisfy [the Ninth Circuit's] holding that a plaintiff can establish reliance by plausibly alleging [he/she] would have behaved differently had the disclosure

_____

[21] In particular, plaintiffs allege they reviewed information on dealer websites, Honda's website, the Subject Vehicles' window stickers, Honda's commercials, YouTube videos, Kelly Blue Book and Edmunds.com.  (See SAC ¶¶ 20, 31, 42, 52, 61, 70.)

been made."  See Anderson v. Apple, 500 F. Supp. 3d 993, 1018 (N.D. Cal. Nov. 16,

2020) (noting that, in "pure omissions" cases, plaintiffs "do not have to point to a

hypothetical, counterfactual piece of marketing in which the disclosure would have

occurred," and need only "plausibly allege that [defendant's] pre-purchase disclosure

would have altered their purchases").

### 3. Concealment

Lastly, Honda argues that, to the extent the Sixteenth Cause of Action, alleging

"Fraudulent Omission or Fraudulent Concealment," is based on the theory that Honda

actively concealed the alleged defect, such claim must be dismissed for failure to plead

more than "mere non-disclosure" of the alleged defect.  (See Mot. 23:17-18.)

As noted above, a defendant's duty to disclose for purposes of a fraudulent

omission or concealment claim can derive from such defendant's "active[ ] conceal[ment]

[of] a material fact from the plaintiff."  See Asghari, 42 F. Supp. 3d at 1328.  "A

defendant's denial of the existence of a defect can state a claim for active concealment."

See Victorino, 2016 WL 6441518, at *9.

Here, plaintiffs allege that Honda, when confronted with complaints of problems

associated with the Infotainment System Defect, denied there was an issue and/or

performed ineffective repairs.  (See SAC ¶¶ 14, 23-24, 34-35, 45-46, 55-56, 65-66,

74-75).  Multiple courts in this circuit have found such allegations sufficient to support a

fraud claim based on active concealment, and the Court finds their reasoning persuasive.

See, e.g., Victorino, 2016 SL 6441518, at *9 (finding allegations in complaint supported

plausible inference of active concealment to support CLRA claim; noting plaintiffs alleged

"that when consumers present[ed] the [vehicles] to an authorized [defendant] dealer for

repair of the transmission, rather than repair the problem under warranty, [defendant]

dealers either inform[ed] consumers that their vehicles [were] functioning properly, or

conduct[ed] repairs that merely mask[ed] the defect" (internal quotation and citation

omitted)); Tietsworth v. Sears, 720 F. Supp. 2d 1123, 1134 (N.D. Cal. 2010) (finding

plaintiffs stated claim for fraudulent concealment where plaintiffs alleged that "when

30

1   [p]laintiffs and [c]lass members contacted [defendant] for service of their defective

2   [m]achines," they "were either told the [m]achines were not defective or denied free

3   service or replacement of the defective parts"); Ho v. Toyota Motor Corp., 931 F.Supp.2d

4   987, 999 (N.D. Cal. 2013) (finding plaintiffs adequately pled active concealment by

5   alleging defendants repaired class vehicles' headlamps only temporarily or replaced them

6   with other defective parts).

### 4.  Summary – Fraud Claims

7

8       Accordingly, plaintiffs' fraud claims, are not subject to dismissal, with the exception

9   of claims brought on behalf of plaintiffs Beech and Kreidel, which claims are, for the

10  reasons set forth below, subject to dismissal as time-barred.

### F.  Unjust Enrichment Claim (Seventeenth Cause of Action)

11

12      Plaintiffs' final cause of action is titled "Unjust Enrichment."  Honda argues said

13  claim "cannot stand under California law where [p]lantiffs have an adequate remedy at

14  law." (See Mot. 23:25-27.)[22]

15      Although "unjust enrichment" itself is "not a cause of action," see McBride v.

16  Boughton, 123 Cal. App. 4th 379, 387 (2004) (noting "[u]njust enrichment" is a "general

17  principle, underlying various legal doctrines and remedies") (internal quotation and

18  citation omitted), the Ninth Circuit has recognized that "when a plaintiff alleges unjust

19  enrichment, a court may construe the cause of action as a quasi-contract claim seeking

20  restitution[,]" see Astiana v. Hain Celestial Grp., Inc., 783 F.3d 753, 762 (9th Cir. 2015)

21  (internal quotation and citation omitted).  In the instant case, the Court will construe

22  plaintiffs' claim as a standalone equitable claim, but nonetheless finds the claim subject

23  to dismissal, given plaintiffs' failure to plausibly allege they lack an adequate remedy at

24  law.  See Sonner v. Premier Nutrition Corp., 971 F.3d 834, 844 (9th Cir. 2020) (holding

25

26      _____

27      [22] As plaintiffs have not invoked any specific state's law for their unjust enrichment
    claim, the presumption is that the law of the forum state, i.e., California, will apply.  See
    Gasperini, 518 U.S. at 427 (holding "[u]nder the Erie doctrine, federal courts sitting in
28  diversity, apply state substantive law and federal procedural law").

United States District Court
Northern District of California

1   "[plaintiff] must establish that [he/she] lacks an adequate remedy at law before securing

2   equitable restitution for past harm under the UCL and CLRA"); see also, e.g., Barrett v.

3   Apple Inc., 523 F. Supp. 3d 1132, 1157 (N.D. Cal. 2021) (finding "under Sonner, a quasi-

4   contract claim cannot survive a motion to dismiss unless the proponent adequately

5   pleads that no legal remedy exists").

6          Accordingly, plaintiffs' unjust enrichment claim is subject to dismissal.

7   **G. Statute of Limitations as to Beech and Kreidel's Claims (Eleventh through**
     **Sixteenth Causes of Action)**

8          Honda argues Beech and Kreidel's claims must be dismissed based on the

9

10  applicable statutes of limitations.[23]

11         Claims under the Virginia Consumer Protection Act ("VCPA") must be brought

12  within two years of accrual, see Sakyi v. Nationstar Mortg., LLC, 2018 WL 11224375, at

13  *2 (E.D. Va. June 22, 2018), and claims for breach of warranty under Virginia law must

14  be brought within four years of accrual, see Moore v. Nat'l Collegiate Athletic Ass'n, 2022

15  WL 2306761, at *2 (E.D. Va. June 27, 2022).[24]  Although "Virginia law generally states

16  that actions accrue at the time of injury, not the time of discovery" exceptions exist for

17  actions in fraud and breach of warranty, in that such claims accrue when the alleged

18  fraud or breach of warranty is or should have been discovered by the plaintiff.  See Peter

19  Farrell Supercars, Inc. v. Monsen, 82 F. App'x 293, 299 (4th Cir. 2003) (holding fraud

20

21         [23] In particular, Honda seeks dismissal, to the extent asserted by Beech and
     Kreidel, of the Eleventh Cause of Action ("Violation of Virginia Consumer Protection Act"),
22  Twelfth and Thirteenth Causes of Action ("Breach of Express Warranty" and "Breach of
     the Implied Warranty of Merchantability," respectively, under Virginia law), Fourteenth
23  and Fifteenth Causes of Action ("Breach of Express Warranty under the MMWA" and
     "Breach of Implied Warranty under the MMWA," respectively), and Sixteenth Cause of
24  Action ("Fraud by Omission or Fraudulent Concealment").

25         [24] The surviving MMWA claims, to the extent asserted by Beech and Kreidel in
26  their individual capacities, are subject to the same four-year statute of limitations as the
     breach of warranty claims brought under Virginia law.  See Horne v. Harley-Davidson,
27  Inc., 660 F. Supp. 2d 1152, 1157 (C.D. Cal. 2009) (noting "[b]ecause [the MMWA]
     contains no express statute of limitations, district courts must look to the most analogous
28  state statute to determine what statute of limitations to apply").

United States District Court
Northern District of California

1   claims under Virginia law "accrue when the fraud is discovered or when it should have

2   been discovered by the exercise of due diligence"); Va. Code Ann. § 8.2-725(2)

3   (providing when "a warranty explicitly extends to future performance of the goods . . . the

4   cause of action accrues when the breach is or should have been discovered").  The law

5   is similar in California; causes of action for fraud must be brought within three years of

6   accrual, see Hellgren v. Providential Home Income Plan Inc., 2006 WL 8447964, at *2

7   (N.D. Cal. Oct. 26, 2006), aff'd, 291 F. App'x 70 (9th Cir. 2008), and in determining when

8   a fraud claim accrues, "the discovery, by the aggrieved party, of the facts constituting the

9   fraud or mistake controls rather than the date the alleged fraud itself occurred."  See id. at

10  *3 (internal quotation and citation omitted).

11         Here, Beech and Kreidel allege they purchased their vehicles on or around

12  September 4, 2017, and March 18, 2017, respectively (see SAC ¶¶ 50, 69), and

13  discovered the alleged Infotainment System Defect within several months of making such

14  purchases (see SAC ¶ 54 (alleging Beech, approximately four months after purchase,

15  began noticing his "Infotainment System . . . exhibited unresponsiveness, including

16  freezing"); ¶ 4 (defining Infotainment System Defect as including "freezes" causing "the

17  inoperability of one or more features"); ¶ 73 (alleging Kreidel began experiencing the

18  Infotainment System Defect "[w]ithin a few months of ownership")).  Although plaintiffs, in

19  their opposition, appear to argue neither Beech nor Kreidel was, at those earlier dates,

20  aware of the magnitude of the problem, the SAC includes no allegations to that effect, nor

21  does it allege the time of or circumstances under which either plaintiff did become aware

22  of such fact.

23         Accordingly, Beech and Kreidel's claims, as currently pleaded, are subject to

24  dismissal as time-barred.[25]

25

26

27         ───────────────

28         [25] In light of this finding, the Court does not address herein plaintiffs' argument that Beech and Kreidel's claims are timely under the doctrine of equitable tolling.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CONCLUSION**

For the reasons stated above, Honda's motion to dismiss is hereby GRANTED in part, and DENIED in part, as follows:[26]

1.  The Fourteenth and Fifteenth Causes of Action (MMWA Claims), to the extent asserted on behalf of a class, are DISMISSED.  To the extent such claims asserted on behalf of plaintiffs in their individual capacities, the Fourteenth Cause of Action is DISMISSED in its entirety, and the Fifteenth Cause of Action is DISMISSED to the extent based on Meisel's breach of implied warranty claim under the Song-Beverly Act.

2.  The Fourth, Sixth, Ninth, Twelfth Causes of Action (Express Warranty Claims) are DISMISSED.

3.  The Third Cause of Action (Implied Warranty Claim under California's Song-Beverly Act), to the extent based on Meisel's vehicle purchase, and the Thirteenth Cause of Action (Implied Warranty Claim under Virginia law) are DISMISSED.

4.  The Eleventh Cause of Action (Violation of Virginia Consumer Protection Act), and the Sixteenth Cause of Action (Fraud by Omission or Fraudulent Concealment), to the extent based on Beech and Kreidel's purchases, are DISMISSED.

5.  The Seventeenth Cause of Action (Unjust Enrichment) is DISMISSED.

In all other respects, the motion is DENIED.  As plaintiffs may be able to remedy the above-discussed deficiencies, plaintiffs are hereby afforded leave to amend. Plaintiffs' Third Amended Complaint, if any, shall be filed no later than October 2, 2023.

**IT IS SO ORDERED.**

Dated: September 6, 2023

MAXINE M. CHESNEY
United States District Judge

_____

[26] Although plaintiffs have amended twice before, such amendments were not predicated on orders of dismissal.

34